**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| Michael Folks and Sharon Manier, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> The Procter & Gamble Company, <br><br> Defendant. | **CLASS ACTION COMPLAINT** <br><br> Case No.: 1:24-cv-00022 <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Michael Folks and Sharon Mainer, on behalf of themselves and all others similarly situated, bring this class action against The Procter & Gamble Company ("P&G"). They allege the following based upon personal knowledge as to themselves, upon investigation by counsel, and upon information and belief.

## I.    INTRODUCTION

1.    This Class Action seeks to remedy P&G's deceptive marketing and labeling of its popular DayQuil and NyQuil medications as being effective decongestants. The problem with P&G's representation is that the sole active ingredient listed as a decongestant in DayQuil and NyQuil is phenylephrine hydrochloride, ("phenylephrine" or "PE").

2.    PE is a drug ingredient with a near century of use for a wide variety of ailments including as a treatment for congestion. It is a common ingredient that has found its way into nearly every drug that is purported to be a decongestant.

1

3.      However, its effectiveness as a decongestant has been in question in the scientific community for nearly two decades with a growing body of evidence indicating that it was minimally effective, if at all.

4.      On September 12, 2023, the United States Food and Drug Administration publicly declared that orally ingested PE is completely ineffective as a nasal decongestant based on the weight of scientific evidence presented.

5.      For decades, P&G has advertised DayQuil and NyQuil as comprehensive cold medicines that could treat or alleviate a wide variety of symptoms such as fevers, aches, sore throats, coughs, runny nose, and nasal congestion and sinus pressure. These symptoms feature heavily in the advertising and feature prominently on the products packaging alongside the related active ingredients, including the subjects of this action.

6.      P&G has willfully ignored decades of scientific, industry, and regulatory knowledge that PE is wholly ineffective as a nasal decongestant and has insisted on this course of deceptive misrepresentation.

7.      And in response, Plaintiffs bring this action against P&G to seek relief for its wrongful conduct detailed below.

## II.      PARTIES

8.      Plaintiff Michael Folks is a citizen of Missouri, residing in the city of Springfield. He purchased DayQuil and NyQuil from his local Walmart.

9.      Plaintiff Sharon Manier is a citizen of California, residing in the city of Riverside. She purchased DayQuil and NyQuil from her local CVS pharmacy.

10.      Defendant The Procter & Gamble Company is an Ohio corporation with its principal place of business at 1 Procter and Gamble Plaza, Cincinnati, OH 45202.

### III.    JURISDICTION AND VENUE

11.    This Court has personal jurisdiction over P&G. The acts and omissions that gave rise to this action occurred in this state and P&G has, at all times relevant, engaged in commercial operations in this state, maintained places of business in this state, and marketed/advertised/distributed/sold the aforementioned products in this state. Similarly, the injuries to Plaintiffs and Class members were caused by the acts and omissions that P&G engaged in within this state.

12.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

13.    Venue is proper in this District under 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District. Venue is also proper under 18 U.S.C. § 1965(a) because the Defendants transact substantial business in this District.

### IV.    COMMON FACTUAL ALLEGATIONS

#### a.    *DayQuil and NyQuil*

14.    P&G manufactures and advertises DayQuil and NyQuil under its Vicks brand. DayQuil and NyQuil are distributed to consumers through retailers, pharmacies, and grocery stores.

15.     DayQuil and NyQuil are marketed and sold as over-the-counter cold medications. They are claimed to treat various symptoms such as Headache, Fever, Sore Throat, Minor Aches & Pains, Nasal Congestion, Sinus Pressure, Sneezing, Runny Nose, and Cough.

16.     On the packaging, DayQuil and NyQuil prominently list the active ingredients and the symptoms these ingredients are intended to treat: Acetaminophen (as a pain reliever and fever reducer), Phenylephrine HCl (as a nasal decongestant), Doxylamine Succinate (as an antihistamine), and Dextromethorphan HBr (as a cough suppressant).

17.     Based upon these representations, a reasonable consumer would understand that these medications would relieve or otherwise alleviate the listed symptoms, including nasal congestion and sinus pressure.

18.     And all reasonable consumers, including Plaintiffs, read the labels on the medications and relied upon them. And indeed, the consumers, including Plaintiffs, were fully entitled to rely on these labels given the heavily regulated nature of the food and drug industries.

19.     The representations that the medications would relieve or otherwise alleviate the symptoms, including nasal congestion, were material to Plaintiffs' and Class members' decisions to purchase the medications since they would not have purchased the medications or would have paid substantially less for them had they known that DayQuil and NyQuil would not be effective at treating one or more of the listed symptoms. In fact, the only reason that Plaintiffs and reasonable consumers would purchase DayQuil and NyQuil was to treat the listed symptoms.

20.     However, the active ingredient purported to treat nasal congestion, Phenylephrine Hydrochloride (PE), was declared to be wholly ineffective as a nasal decongestant by the FDA in

September of 2023. In its announcement, the FDA described PE as being no more effective in this function than a placebo.[1]

### b.    *Phenylephrine and its Sordid History*

21.    Phenylephrine is an over-the-counter ingredient that has been available in the United States for more than 75 years. It had been approved for the temporary relief of nasal congestion due to various ailments and conditions ranging from the common cold to hay fever and allergies.

22.    Despite this long history, questions about PE's effectiveness as a nasal decongestant have been raised for the past two decades.

23.    On May 1, 2006, two professors at the University of Florida, Dr. Leslie Hendeles, and Dr. Randy Hatton, published a letter in the Journal of Allergy and Clinical Immunology titled: *Oral phenylephrine: An ineffective replacement for pseudoephedrine?*[2]

24.    In this letter, the professors questioned the effectiveness of PE for nasal congestion based upon the results of multiple double–blind, placebo-controlled studies, that showed PE was no more effective than a placebo in reducing nasal airway resistance. Moreover, the letter noted that the studies relied on by the FDA to approve PE were unpublished, manufacturer-sponsored studies conducted by commercial testing laboratories.[3]

25.    On February 1, 2007, the professors filed a Citizens Petition with the FDA concerning PE Drugs that requested the dosage of oral phenylephrine (PE) be re-evaluated and

---

[1] *Meeting of the Nonprescription Drugs Advisory Committee September 11-12, 2023*, Consumer Healthcare Products Association (September 12, 2023), available at https://www.fda.gov/media/171917/download.
[2] Leslie Hendeles, PharmD and Randy C, Hatton, PharmD, *Oral phenylephrine: An ineffective replacement for pseudoephedrine?* The Journal of Allergy and Clinical Immunology (May 1, 2006), available at https://www.jacionline.org/article/S0091-6749(06)00633-6/fulltext.
[3] *Id.*

that approval for use in children under twelve years old be withdrawn. The Petition further stated that there was no data on the safety of PE in children under twelve years old.[4]

26.    As a result of the 2007 Citizens Petition, the FDA's Nonprescription Drugs Advisory Committee met on December 14, 2007 and concluded that the products could continue to be sold, but 9 of 12 of the committee members voted that "new studies on response to higher doses were required".[5]

27.    Schering-Plough Pharmaceuticals, a manufacturer of drugs containing PE, responded to the recommendations of the Committee and the Division by conducting a multicenter, phase 2, parallel trial among 539 adults with seasonal allergic rhinitis. The results of the study revealed no significant differences between placebo and active treatment groups.[6]

28.    McNeil Consumer Healthcare similarly conducted a safety and tolerability study of PE. This study also revealed no difference in safety endpoints between placebo and 10, 20 and 30 mg of PE even though systemic exposure increased disproportionately with dose.  This finding is especially telling because both the relief of congestion and systemic endpoints such as change in blood pressure and pulse are moderated by alpha adrenergic stimulation. The absence of a significant effect on the latter at the higher doses suggest that the concentrations reached are not sufficient to stimulate alpha adrenergic receptors, meaning that no tangible changes to congestion levels would be felt.[7]

---

[4] Leslie Hendeles, PharmD, Randt C. Hatton, PharmD, and Almut G. Winterstein, *Citizen's Petition*, pub. February 1, 2007, available at https://news.ashp.org/-/media/NewsCenter/ASHP-News/2023/docs/University-of-Florida-Citizen-Petition-FDA-2007-P-0108-0005.pdf.

[5] Leslie Hendeles, PharmD and Randt C. Hatton, PharmD, *Citizen's Petition*, pub. November 4, 2015, available at https://truthinadvertising.org/wp-content/uploads/2023/02/Hatton-Hendeles-2015-Citizens-Petition-re-oral-phenylephrine.pdf.

[6] *Id.*

[7] *Id.*

29.     On November 4, 2015, yet another Citizens Petition was filed by two professors at the University of Florida. The petition asked the FDA "to remove oral phenylephrine from the Final Monograph for OTC nasal decongestant products." Specifically, the petition asked the FDA to remove Phenylephrine and to remove phenylephrine bitartrate (PEB), "both individually and in combination drug products in an effervescent dosage form."[8]

30.     According to the 2015 Citizens Petition, "Two additional studies published in 2009 provide further evidence of the absence of a decongestant effect from the FDA-approved nonprescription dose of 10 mg".[9] This 2015 Citizens Petition was further supported by the American Academy of Allergy, Asthma & Immunology.[10]

31.     And, as described above, the FDA ultimately declared that PE was wholly ineffective as a nasal decongestant and functioned as little more than a placebo.

c.      *P&G's Misrepresentations and Culpability*

32.     DayQuil and NyQuil are some of the most widely known and widely sold OTC cold medications throughout the United States. And as the manufacturer and marketer of these prominent drugs, P&G was aware of, or should have been aware of, these questions and studies regarding PE's effectiveness. Yet P&G did not change PE to another active ingredient for treating congestion, even though alternatives *were* available. And even after substantial scientific evidence determining PE to be as effective as a placebo, P&G did not change the marketing and packaging

---

[8] *Id.*

[9] *Id.*

[10] Eli O. Meltzer, MD; Jonathan A. Bernstein, MD; J. Wesley Sublett, MD., *American Academy of Allergy, Asthma & Immunology's and American College of Allergy, Asthma & Immunology's Statement of Support of Citizens' Petition for Removal of Oral Phenylephrine from Over-the-Counter Status*, American Academy of Allergy, Asthma & Immunology's and American College of Allergy, Asthma & Immunology (May 4, 2022), available at https://college.acaai.org/wp-content/uploads/2022/05/oral-phenylephrine-final-statement-in-support-of-citizens-petition-05-4-22.pdf.

of DayQuil and NyQuil to reflect the fact that it does not alleviate nasal congestion and sinus pressure.

33.     Further, on information and belief, P&G did not perform additional testing and quality oversight of DayQuil and NyQuil to ascertain their true effectiveness for treating nasal congestion, or deliberately suppressed or avoided doing so. And, on information and belief, P&G did not undertake such testing even after serious questions were raised about PE's effectiveness. Had they performed such testing and disclosed the results, the data would lead to the same conclusions as the previous scholarly studies and the September 2023 FDA determination: PE is entirely ineffective at treating nasal congestion.

34.     It was therefore misleading for P&G to advertise and label DayQuil and NyQuil as a decongestant even though it knew, or it should have known, that the sole active ingredient for treating congestion in the drug was a placebo.

35.     P&G clearly intended for Plaintiffs and Class members to rely on its representations that DayQuil and NyQuil were decongestants since PE and congestion feature heavily on the front and back of the packaging.

36.     P&G's deceptive and misleading practices proximately caused harm to Plaintiffs and the Class members since they would not have purchased DayQuil and NyQuil, or would have paid substantially less for them, had they known that they were ineffective as decongestants. They would have instead opted for other OTC medications that used effective active ingredients for treating congestion.

## V.    FACTS SPECIFIC TO PLAINTIFFS

**a.    Plaintiff Michael Folks' Experience**

37.     Plaintiff Folks purchased DayQuil and NyQuil products in the fall of 2023 from a Walmart in Springfield, Missouri.

38.     In anticipation of the upcoming cold and flu season, Plaintiff Folks bought the drugs to treat various symptoms of the common cold, including nasal congestion. He carefully reviewed the packaging and relied on P&G's representation that DayQuil and NyQuil alleviate congestion.

39.     Plaintiff Folks would not have purchased the medications, or he would not have paid the amount he did for them, had he known they would not alleviate congestion.

40.     He later learned from social media that the common ingredient phenylephrine, often used as an alleged decongestant in cold medicines such as DayQuil and NyQuil, had been declared to be a placebo.

41.     Plaintiff Folks was damaged by his reliance on P&G's misleading and deceptive representations since he purchased a drug that materially failed at its purpose.

**b.     Plaintiff Sharon Manier's Experience**

42.     Plaintiff Manier purchased DayQuil and NyQuil products in the fall of 2023 from a CVS pharmacy in her town of Riverside, California.

43.     Plaintiff Manier bought the drugs to treat various symptoms of the common cold, including nasal congestion. She carefully reviewed the packaging and relied on P&G's representation that DayQuil and NyQuil alleviated congestion.

44.     Plaintiff Manier would not have purchased the medications, or she would not have paid the amount he did for them, had he known they would not alleviate congestion.

45.     Shortly after purchase, Plaintiff Manier consumed the drugs in the hopes of alleviating the symptoms of a cold she was experiencing, including a particularly severe case of nasal congestion. However, the drugs proved totally ineffective at reducing nasal congestion.

46.      Plaintiff Manier later learned from the news and social media that the active ingredient phenylephrine, commonly alleged to relieve congestion, had been determined to be a placebo.

47.      Plaintiff Manier was damaged through her reliance on P&G's misleading and deceptive representations since she purchased a drug that materially failed at its purpose.

## VI.      FED. R. CIV. P. 9(B) ALLEGATIONS

48.      P&G made material misrepresentations and/or omissions of fact in its labeling and marketing of DayQuil and NyQuil by representing that they could treat or otherwise alleviate nasal congestion.

49.      P&G's alleged conduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing that DayQuil and NyQuil could treat or otherwise alleviate nasal congestion. P&G knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet P&G has and continues to represent that DayQuil and NyQuil are nasal decongestant products when they are not.

50.      P&G made the material misrepresentations and/or omissions detailed herein, including that DayQuil and NyQuil are nasal decongestants, continuously throughout the applicable class period(s).

51.      P&G's material misrepresentations and omissions, that the DayQuil and NyQuil are effective nasal decongestants, were prominently featured on the front and back of the products' packaging, which would instantly draw the attention of all reasonable consumers, including Plaintiffs and class members. And as alleged in detail throughout this Complaint, Plaintiffs and class members read and relied on P&G's representations and omissions before purchasing the products.

52.     P&G made these material misrepresentations and omissions, for the express purpose of inducing Plaintiff and Class members to purchase its DayQuil and NyQuil products. As such, P&G unlawfully profited by selling the misrepresented products to at least thousands of consumers throughout the nation.

## VII.    CLASS ALLEGATIONS

53.     Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3), Plaintiffs bring this action on behalf of themselves and the following Classes:

> **Nationwide Class:** All persons in the United States who purchased DayQuil and/or NyQuil medicines in the United States for personal use and not for resale during the applicable statute of limitations period.

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change or expand the Class definition after conducting discovery.

54.     <u>Numerosity:</u> Upon information and belief, the Class is so numerous that joinder of all members is impracticable with the number of class members estimated to be in the hundreds of thousands. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process. The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

55.     <u>Existence and Predominance of Common Questions of Fact and Law:</u> Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

> a.  Whether Defendant markets and advertises DayQuil and NyQuil in a way that is false or misleading;

11

b. Whether by the misconduct set forth in this complaint, Defendant has engaged and continues to engage in unfair, fraudulent, or unlawful business practices;

c. Whether Defendant's conduct was committed knowingly and/or intentionally;

d. Whether Defendant's conduct constitutes violations of law;

e. Whether Defendant had a duty to correct its fraudulent statements;

f. Whether Class members were harmed by Defendant's false statements;

g. Whether Defendant was unjustly enriched by its conduct;

h. Whether the Class is entitled to punitive damages;

i. Whether the Class is entitled to recover statutory attorney's fees;

j. Whether, as a result of Defendant's misconduct as alleged herein, Plaintiffs and Class Members are entitled to restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

56. <u>Typicality:</u> All of Plaintiffs' claims are typical of the claims of the Class since Plaintiffs and all members of the Class were harmed in the same manner by the same conduct. Likewise, the relief to which Plaintiffs are entitled to is typical of the Class because Defendant has acted, and refused to act, on grounds generally applicable to the Class.

57. <u>Adequacy:</u> Plaintiffs are adequate class representatives because their interests do not materially or irreconcilably conflict with the interests of the Class they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor their counsel have any interests that are antagonistic to the interests of other members of the Class.

58.   <u>Superiority:</u> Compared to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class, a class action is the most superior. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

59.   Plaintiffs could not have discovered that the active ingredient in DayQuil and NyQuil was ineffective as a decongestant even with the exercise of reasonable due diligence. Thus, the applicable limitations periods did not begin to accrue until Plaintiffs actually discovered P&G's wrongful acts and omissions after the FDA's announcement was made public.

### B.   Fraudulent Concealment Tolling

60.   All applicable statutes of limitation have also been tolled by P&G's knowing and active fraudulent concealment and misrepresentations about the effectiveness of phenylephrine as a nasal decongestant. As a major manufacturer and distributor of pharmaceutical products, P&G was under a continuing duty to disclose the true character, quality, efficacy, safety issues and safety concerns affecting its medicines to consumers.

61.     Plaintiffs and Class members reasonably relied upon P&G's knowing, affirmative misrepresentations and/or active concealment when they purchased DayQuil and NyQuil based upon advertisements and product packaging that claimed the drugs would alleviate nasal congestion.

62.     And because Defendant actively concealed the true facts about the ineffectiveness of phenylephrine, it is estopped from relying on any statutes of limitations defense.

## IX.    CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTIES

63.     Plaintiffs incorporate and re-allege the allegations from Paragraphs 1 through 62 as if fully set forth herein.

64.     Plaintiffs, and each member of the Class, formed a contract with P&G at the time Plaintiffs and the other Class members purchased DayQuil and NyQuil. The terms of the contract include the promises and affirmations of fact made by Defendant on product packaging and through marketing and advertising, including that the product would be effective as a nasal decongestant. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiffs and the members of the Class and P&G

65.     P&G expressly warranted that its DayQuil and NyQuil were fit for ordinary use and effective as a decongestant.

66.     At all times relevant all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. Ann. § 47-2313; Ark. Code. Ann. § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. Ann. § 42a-2-313; 6 Del. Code. § 2-

313; D.C. Code. § 28:2-313; Fla. Stat. Ann. § 672.313; Ga. Code. Ann. § 11-2-313; Haw. Rev. Stat. § 490:2- 313; Idaho Code § 28-2-313; 810 Ill. Comp. Stat. Ann. 5/2-313; Ind. Code Ann. § 26-1-2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; 11 Me. Rev. Stat. Ann. § 2-313; Md. Code. Ann. § 2-313; Mass. Gen. Law Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2313; Minn. Stat. Ann. § 336.2-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2-313; Mont. Code Ann. § 30-2-313; Nev. Rev. Stat. U.C.C. § 104.2313; N.H. Rev. Ann. § 382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. Ann. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. C.S. § 2313; P.R. Laws. Ann. Tit. 31, § 3841, et seq.; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Utah Code Ann. § 70A-2-313; Va. Code § 8.2-313; Vt. Stat. Ann. 9A § 2-313; W. Va. Code § 46-2-313; Wash. Rev. Code § 62A 2-313; Wis. Stat. Ann. § 402.313; and Wyo. Stat. § 34.1-2-313.

67.    P&G knew or should have known that DayQuil and NyQuil were consumed for the intended purpose of treating, *inter alia*, nasal congestion (or is strictly liable in the event of lack of actual or constructive knowledge), and expressly warranted that DayQuil and NyQuil were of merchantable quality and fit for that purpose.

68.    P&G breached its express warranty because DayQuil and NyQuil were not of merchantable quality, nor fit for the product's ordinary purpose, and did not conform to the standards generally applicable to such goods.

69.    P&G's express warranties were reflected in DayQuil and NyQuil's product labeling (*e.g.*, label, instructions, packaging) and promotion and marketing material, all of which uniformly identified PE as an active ingredient for effective treatment of nasal congestion. P&G's product

labeling and other materials had to be truthful, accurate, and non-deceptive. But this was not the case, insofar as this material did not disclose that PE was ineffective for treating nasal congestion.

70.    DayQuil and NyQuil did not fulfill this intended purpose. Plaintiffs and other Class members bargained for an adequately made, adequately labeled product, that performed as warranted.  But each DayQuil and NyQuil were not adequately made, were not adequately labeled, and did not perform as warranted.

71.    Plaintiffs and other Class members purchased the DayQuil and NyQuil in reliance upon P&G's skill and judgment and the express warranties made.

72.    Plaintiffs and other Class members were reasonably expected purchasers who would consume DayQuil and NyQuil based upon representations made by P&G.

73.    Plaintiffs and Class members did not alter the DayQuil and NyQuil after their purchase.

74.    As a direct and proximate result of P&G's breach of express warranty, Plaintiffs and other Class members have been injured and suffered damages in that the DayQuil and NyQuil they purchased were so inherently flawed, unfit, or unmerchantable as to have significantly diminished or no intrinsic market value.

**COUNT II**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

75.    Plaintiffs incorporate and re-allege the allegations from Paragraphs 1 through 62 as if fully set forth herein.

76.    P&G affirmatively misrepresented material facts including the fact that DayQuil and NyQuil were effective at treating nasal congestion.

77.    P&G's actions had the effect of fraudulently inducing customers to purchase DayQuil and NyQuil – products which P&G *knew* were ineffective at treating congestion.

Plaintiffs and Class Members would not have purchased DayQuil and NyQuil had they known the truth or would have paid substantially less for them.

78.    The impact this representation had on the Plaintiffs and Class members' decision-making renders it material. And P&G knew or should have known that this representation was material. Further, P&G knew that this misrepresentation would induce Class Members to purchase the drug.

79.    P&G knew or should have known about the misleading labeling of DayQuil and NyQuil as a result of industry and regulatory guidance dating back decades. Thus, it knowingly or recklessly disregarded the available industry and regulatory guidance. In the alternative, on information and belief, P&G discovered that PE was ineffective as a decongestant based upon its own internal testing but knowingly or recklessly disregarded the data. In effect, P&G actively concealed their misrepresentations and omissions from the Class, government regulators, and the public.

80.    But for Defendant's misrepresentations and omissions, Plaintiffs and Class Members would not have purchased DayQuil and NyQuil to treat congestion.

81.    Plaintiffs and Class members were justified in relying on P&G's misrepresentations on the drug packaging and drug advertising.  No reasonable consumer would have paid what they did for DayQuil and NyQuil but for Defendants' unlawful conduct. As such, reliance may be presumed to the extent necessary.

82.    Plaintiffs and Class members were damaged due to P&G's misrepresentations.

<u>**COUNT III**</u>
<u>**FRAUD BY NEGLIGENT MISREPRESENTATION**</u>

83.    Plaintiffs incorporate and re-allege the allegations from Paragraphs 1 through 62 as if fully set forth herein.

84.    P&G had a duty to represent the effectiveness of its products accurately and truthfully.

85.    P&G's statements were false at the time the misrepresentations were made since PE has been scientifically proven to be completely ineffective as a decongestant. P&G should have known that PE was ineffective as a decongestant based on the available industry and regulatory material yet P&G negligently disregarded this material or was otherwise unaware of this fact. In the alternative, P&G should have discovered that PE was ineffective as a decongestant based upon its own internal testing.

86.    P&G therefore failed to fulfil its duty to represent the effectiveness of its products accurately and truthfully. And this failure constitutes negligence.

87.    Plaintiffs and Class members would not have purchased DayQuil or NyQuil, or would have paid substantially less for them, had they known that they were ineffective as decongestants. Thus, P&G's misrepresentations were material. And P&G knew that its misrepresentations would induce Class Members to purchase these drugs.

88.    Plaintiffs and Class members were justified in relying on P&G's misrepresentations. And the same or substantively identical misrepresentations were communicated to each Class member.

89.    Plaintiffs and Class members were directly and proximately injured by P&G's negligence since they purchased a drug that was ineffective.

**COUNT IV**
**VIOLATION OF STATE CONSUMER PROTECTION LAWS**

90.    Plaintiffs incorporate and re-allege the allegations from Paragraphs 1 through 62 as if fully set forth herein.

91.    P&G has violated the following state consumer protection laws:

a.      Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5(5), (7) and (27), *et seq.*;

b.      Arizona Consumer Fraud Act, A.R.S. § 44-1522;

c.      Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107(a)(1)(10) and 4-88-108(1)(2), *et seq.*;

d.      California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and the California Unfair Competition Law, Cal. Bus. and Prof. Code, § 17200, *et seq.*;

e.      Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), *et seq.*;

f.      Delaware Deceptive Trade Practices Act, Del. Code Ann. Title 6, § 2532(5) and (7), *et seq.*, and the Delaware Consumer Fraud Act, Del. Code Ann. Title 6 § 2513, *et seq.*;

g.      Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204(1), *et seq.*;

h.      Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-393(a) and (b)(2), (5) and (7), *et seq.*;

i.      Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. Ann. §§ 481A-3(a)(5), (7) and (12), *et seq.*; and the Hawaii Consumer Protection Act, Haw. Rev. Stat. Ann. § 480-2(a), *et seq.*;

j.      Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and (18), *et seq.*; and Idaho Code § 48-603C, *et seq.*;

k.      Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Stat. § 505/2, *et seq.*;

l.      Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-3(a) and (b)(1) and (2), *et seq.*;

m.      Iowa Consumer Fraud Act, I.C.A. §§ 714H.3 and 714H.5, *et seq.*;

n.      Kansas Consumer Protection Act, Kan. Stat. §§ 50-626(a) and (b)(1)(A)(D) and (b)(3), *et seq.*;

o.      Kentucky Consumer Protection Act, K.R.S. § 367.170(1) and (2), *et seq.*;

p.      Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1405(A), *et seq.*;

q.      Maine Uniform Deceptive Trade Practices Act, 10 M.R.S.A. §§ 1212(1)(E) and (G), et seq., and the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 207, et seq.;

r.      Maryland Consumer Protection Act, Md. Code Commercial Law, § 13-301(1) and (2)(i), and (iv) and (9)(i), et seq.;

s.      Massachusetts Consumer Protection Act, Ma. Gen. Laws Ann. Ch. 93A § 2(a), et seq.;

t.      Michigan Consumer Protection Act, M.C.P.L.A. § 445.903(1)(c)(e),(s) and (cc), et seq.;

u.      Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7) and (13), et seq., the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.31, subd. 3(a);

v.      Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-5(1), (2)(e) and (g), et seq.;

w.      Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1), et seq.;

x.      Montana Unfair Trade Practices and Consumer Protection Act, MCA §§ 30-14-103, et seq.;

y.      Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302(a)(5) and (7), et seq.;

z.      Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0915(5) and (7), et seq.;

aa.     New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2(v) and (vii), et seq.;

bb.     New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, et seq.;

cc.     New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2(D)(5)(7) and (14) and 57-12-3, et seq.;

dd.     New York Business Law, N.Y. Gen. Bus. Law § 349(a);

ee.     North Carolina Unfair Trade Practices Act N.C.G.S.A. § 75-1.1(a), et seq.;

ff.     North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-02, et seq.;

gg.     Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02(A) and (B)(1) and (2), et seq.;

hh.  Oklahoma Consumer Protection Act, 15 Okl. Stat. Ann. § 753(5), (7) and (20), *et seq.*; and the Oklahoma Deceptive Trade Practices Act, 78 Okl. Stat. Ann. § 53(A)(5) and (7), *et seq.*;

ii.  Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.608(1)(e)(g) and (u), *et seq.*;

jj.  Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-2(4)(v)(vii) and (xxi), and 201-3, *et seq.*;

kk.  Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1(6)(v), (vii), (xii), (xiii) and (xiv), *et seq.*;

ll.  South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20(a), *et seq.*;

mm.  South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1), *et seq.*;

nn.  Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104(a) and (b)(5) and (7);

oo.  Texas Deceptive Trade Practices- Consumer Protection Act, V.T.C.A., Bus. & C. § 17.46(a), (b)(5) and (7), *et seq.*;

pp.  Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-4(1) and (2)(a) and (b);

qq.  Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a), *et seq.*;

rr.  Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200(A)(5)(6) and (14), *et seq.*;

ss.  Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, *et seq.*;

tt.  West Virginia Consumer Credit and Protection Act, W.V.A. Code § 46A-6-104, *et seq.*;

uu.  Wisconsin Deceptive Trade Practices Act, W.S.A. § 100.20(1), *et seq.*; and

vv.  Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-105(a), (i), (iii) and (xv), *et seq.*

92.  Plaintiffs and Class members are "consumers" within the meaning of the above statutes.

93.     P&G's conduct alleged herein constitutes trade or commerce or other actionable activity within the meaning of the above statutes.

94.     P&G's conduct alleged herein constitutes unfair, deceptive, misleading, or otherwise actionable practices under the above statutes since it labeled and advertised DayQuil and NyQuil as being effective at treating or alleviating nasal congestion.

95.     To the extent applicable, P&G knew, or should have known, that its fraudulent and deceptive acts, omissions, or concealment would induce reliance and that reliance can be presumed under the circumstances. As a direct and proximate result of P&G's unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and other Class members have suffered damages – an ascertainable loss – in an amount to be proven at trial.

## COUNT V
## UNJUST ENRICHMENT

96.     Plaintiffs incorporate and re-allege the allegations from Paragraphs 1 through 62 as if fully set forth herein.

97.     P&G profited handsomely from the sales of DayQuil and NyQuil in the United States. However, P&G had fraudulently labeled and advertised DayQuil and NyQuil as being effective decongestants despite the active ingredient PE being a known placebo and ineffective to combat congestion. This misrepresentation renders these profits unjust and wrongful.

98.     Meanwhile, Plaintiffs and Class members were unjustly deprived of money they paid for DayQuil and NyQuil since they were not effective as labeled.  It would be inequitable and unconscionable for P&G to retain the profit, benefit, and other compensation obtained from Plaintiffs and Class members as a result of their wrongful conduct alleged in this Complaint and this relief is recoverable to the extent there is no adequate remedy at law for Plaintiffs and Class members.

99.    Plaintiffs and Class members are entitled to seek restitution from P&G as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by P&G by virtue of its wrongful conduct.

**COUNT VI**
**NEGLIGENCE**

100.    Plaintiffs incorporate and re-allege the allegations from Paragraphs 1 through 62 as if fully set forth herein.

101.    P&G owed a duty to Plaintiffs and the Class to use and exercise reasonable and due care in the manufacturing and sale of its drugs.

102.    P&G owed a duty to Plaintiffs and the Class to ensure that the drugs it sold were effective as stated.

103.    P&G owed a duty of care to Plaintiffs and the Class because they were the foreseeable, reasonable, and probable user of its drugs and the foreseeable, reasonable, and probable victim of any fraudulent and deceptive activities.  P&G knew, or should have known, that DayQuil and NyQuil were ineffective as decongestants. Further, P&G was in the best position to uncover and remedy these shortcomings through correcting the label, changing the ingredient, or other corrective actions.

104.    However, P&G failed to undertake such corrective actions. Upon information and belief, P&G inadequately oversaw its research, development, testing, and sale of DayQuil and NyQuil. With the use of reasonable care, P&G should have discovered that PE was ineffective as a decongestant and P&G should have undertaken resulting corrective action. However, in failing to do so, P&G breached the duties it owed to Plaintiffs and the Class by selling and profiting from falsely labeled DayQuil and NyQuil.

105.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.  Certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' Counsel as Class Counsel;

B.  Declare that P&G is liable under each and every one of the above-enumerated causes of action;

C.  Grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

D.  Award Plaintiffs and Class members compensatory, consequential, and general damages in an amount to be determined at trial;

E.  Award Plaintiffs and Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

F.  Award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G.  Award pre- and post-judgment interest at the maximum legal rate;

H.  Award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

I.  Grant all other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Date: January 17, 2024                          Respectfully submitted,


Terence R. Coates – Trial Attorney
**MARKOVITS, STOCK & DE MARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: 513.651.3700
Fax: 513.665.0219
tcoates@msdlegal.com


Bryan L. Clobes
Daniel O. Herrera
Alex Lee (*pro hac vice* anticipated)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
bclobes@caffertyclobes.com
dherrera@caffertyclobes.com
alee@caffertyclobes.com